## Richmond

The American Legion, Department of Virginia *v.*
The William Byrd Press, Inc.

March 11, 1937.

Present, Campbell, C. J., and Hudgins, Gregory,
Browning, Eggleston and Spratley, JJ.

1

The opinion states the case.

*Parrish, Butcher & Parrish*, for the plaintiff in error.

*Robert G. Cabell, Archibald G. Robertson, Hunton, Williams, Anderson, Gay & Moore*, and *Tucker, Bronson, Satterfield & Mays*, for the defendant in error.

BROWNING, J., delivered the opinion of the court.

This case brings before us for review, a controversy between William Byrd Press, Inc., and The American Legion, Department of Virginia, over the cost of the printing of the Virginia Legionnaire, for a period of four months, beginning with the May, 1932, issue.

The contestants will usually hereafter be referred to as the Press and the Legion, respectively.

The Legionnaire is the official organ of the Virginia Department of the Legion. The Press had printed the publication since the year 1929. At first, the work was done under a contract running for the period of six months. At the termination of this arrangement, the printing was continued on a monthly extension of the contract until and including the April, 1932, issue. With the purpose of economy in view, the Legion, in March, 1932, called for bids from a number of printers for printing its paper for the period of twelve months, beginning with the May, 1932, issue. None of the submitted bids was accepted, as contended by the Legion, but denied by the Press. The editing and publishing of the paper was the function of the publication

committee of the Legion. This committee, on April 21, 1932, awarded a contract to Ernest C. Pollard and Robert H. Thomas, for the publication of the Virginia Legionnaire for the period of four months, embracing the months of May, June, July and August, of 1932.

The Legion performed its obligation of payment under the provisions of its contract with Pollard and Thomas. The Press was paid a part of its charges for printing the Legionnaire by this firm, it maintaining that it had secured the services of the Press to do the printing incident to the issuance of the four issues of the paper.

The Press contended that its bid submitted in March, 1932, was accepted by the Legion, and that under a contract so established, the publication of the paper was for, and on the Legion's account, and that the issues for the four months were but a part of the twelve month period embraced in the contract.

The Press made demand of the Legion on the 23rd of September, 1932, for the balance alleged to be due it. This was declined and this suit ensued, which resulted in a verdict of the jury for the plaintiff, for the amount claimed, $1,313.90, which was sustained by the judgment of the trial court.

The very basis of the plaintiff's claim is the existence of a contract between itself and the Legion. This it must establish, else its failure is inevitable.

We are not unmindful of the fact that the plaintiff is before us buttressed by a verdict of a jury and the judgment of the court in its favor. While this is potent, as we have so frequently said, in varying phrase, yet it is not insurmountable.

We have said with equal emphasis that the duty of the court to set aside a verdict of a jury is not less imperative, where the same is not justified by the law and the evidence. *Bohlkin* v. *Portsmouth*, 146 Va. 340, 348, 131 S. E. 790, 792, 44 A. L. R. 810; *Nicholson* v. *Garland*, 156 Va. 745, 158 S. E. 901. Our primal duty is to determine if the evidence affords proof of such a contract as is asserted by the Press.

It is urged, as has been already suggested, that the bid of March, 1932, of the Press, was accepted by the Legion. If

that be so, then little else is needed to make firm the plaintiff's contention. To maintain this contention, the Press introduced its president, Mr. Richmond Maury, who was asked how he knew the William Byrd Press was going to do the work. He replied, "Because we were called up, as usual, to get the material and put out the May issue."

This examination then followed:

"Q. Did you get any written communication that your firm was awarded the contract?

"A. We didn't get it that time or the time before.

"Q. Did you ever get it?

"A. Not until 1935, on figures asked for in 1934.

"Q. Was it transmitted by telephone or a personal call?

"A. I don't know. I might have seen him in his office.

\*    \*    \*    \*    \*    \*    \*    \*

"Q. Did anything tell you that the contract would have to be authorized by a Publication Committee?

"A. I have no recollection of it.

"Q. Did anybody tell you that the contract would have to be ratified by a Publication Committee?

"A. I have no recollection of it.

"Q. Did anybody tell you that you would have to talk to anybody on the Publication Committee?

"A. I don't recall it.

On cross examination of the same witness, the following took place:

"Q. Now what time was it that you considered that the American Legion had accepted your bid for the publication of twelve issues of the Virginia Legionnaire, beginning with the May issue, 1932?

"A. When we were given the material for the issue.

"Q. When did you get the material for that issue?

"A. The work sheet will show. I think it was April something.

"Q. April 25th?

"A. I don't recall.

"Q. Do you know who sent the material to you?

"A. No.

\* \* \* \* \* \* \* \*

"Q. Was the only reason you thought the American Legion accepted your bid because the material for the May issue of the Legionnaire appeared at your plant?

"A. That is one of the reasons.

"Q. What were the other reasons?

"A. They accepted our invoices at the new prices. That was the same method they used in 1929 in accepting our bid and the same method they used in 1933 in accepting our bid.

\* \* \* \* \* \* \* \*

"Q. Do you deny that Thomas or Pollard brought the May material to your plant?

"A. No.

\* \* \* \* \* \* \* \*

"Q. Mr. Maury, I hand you check No. 61, dated June 7, 1932, payable to William Byrd Press, Incorporated, signed by The Virginia Legionnaire, Ernest C. Pollard, Editor, R. H. Thomas, Business Manager, and ask you if that check was not in payment of your work on the May issue of the Legionnaire?

"A. Yes.

"Q. And for the identical amount of your invoice?

"A. Yes.

"Q. I ask you was not that endorsed by you and credit given on your books for the May issue?

"A. That's right.

\* \* \* \* \* \* \* \*

"Q. You just went on and accepted it, did you?

"A. Yes.

"Q. That, in substance, was your attitude, was it?

"A. Yes.

"Q. I hand you check No. 206, dated August 18, 1932, payable to William Byrd Press, for $300.00, signed by The Virginia Legionnaire, Ernest C. Pollard, Editor, and R. H. Thomas, Business Manager, and ask you what that check was for?

"A. That was applied to printing the American Legion.

"Q. The Virginia Legionnaire do you mean?

"A. Yes, The Virginia Legionnaire.

"Q. For what month?

"A. They didn't pay for any month. It was paid on account.

"Q. Will you please state the circumstances under which you acquired this check?

"A. I don't recall them.

"Q. Didn't you go to Pollard and Thomas's office and ask for it?

"A. I don't recall. I went there a number of times and asked for money. I am willing to admit that I did.

"Q. Will you tell us the circumstances under which you acquired the first check I showed you?

"A. I don't know.

"Q. Did the correspondence that was introduced this morning suggest anything to your memory about that?

"A. I don't recall anything.

"Q. I refer to your letter of June 6th addressed to Mr. Glenn Elliott, the last paragraph thereof:

" 'On my desk this morning I found a note carrying a telephone message for which I thank you very sincerely. It has been destroyed.'

"Q. Do you recall what that note was?

"A. I believe that I do now. Mr. Elliott was notifying me that he was sending a check to Pollard and Thomas and I had better run down and get it.

"Q. And did you run down and get it?

"A. I don't recall. I got it."

Mr. Maury further testified that the bills or invoices of his company, the Press, were invariably sent to the American Legion. The manifest effect of this, if it were a fact, is its tendency to show that only the Legion was looked to for payment of the bills. The witness was then confronted with bills which went out from his office and the following examination with reference to them ensued:

"Q. I hand you these bills and ask you if they are bills from your office?

"A. (Examining). It seems that I was mistaken somehow on the billing.

"Q. Those are your billheads?

"A. Yes.

"Q. Here is one to Mr. Ernest C. Pollard, July 1, 1932, on the billhead of The William Byrd Press for $383.26; here is one made out to Mr. Ernest C. Pollard, July 7, 1932, American Legion, Department of Virginia, correcting mailing list, July issue, $69.92; and here is one dated July 7th, made out to Mr. Ernest C. Pollard for the July issue of the Virginia Legionnaire, $346.59. What month do those (last two) invoices cover?

"A. They cover the issue of July.

"Q. And this (first) one is for June?

"A. I judge so.

"Q. And that check you took in August from Pollard and Thomas was for $300?

"A. Yes."

It will be remembered that Mr. Maury is the president of the plaintiff company, and was an active official in its conduct and operation during the period involved here. His testimony was largely relied upon to establish the plaintiff's claim, thus we have quoted from it rather fully.

The Legion's Publication Committee, as an entity, and its members, as individuals, have been conspicuous participants in the subject of the entire controversy, and yet Mr. Maury knew nothing of their relations to it.

The first step made by the Legion looking to a change in the publication of The Legionnaire, was the call for bids on March 17, 1932.

The letter of Mr. Glenn Elliott of that date, transmitting the required specifications to the Press, was marked for the attention of Mr. Richmond Maury. All bids were to be addressed to the Publication Committee, and any additional data desired would be supplied by it.

Mr. Maury was mistaken as to whom the bills or invoices,

issued from his office, were sent, and this despite the fact that he received checks for work done, signed by Pollard, as Editor, and Thomas, as Business Manager, of The Legionnaire. One of these checks represented work done on the May issue.

We point to these particular things to stress the witness' utter lack of accurate and definite knowledge touching the matters about which he was called upon to testify.

■ The contention is that his company had a printing contract with the Legion, from the performance of which the latter had never been released.

There is nothing in the record that establishes this.

There cannot be any doubt that plaintiff knew that the contract for this work had been awarded to Pollard and Thomas and that this firm had taken charge of The Legionnaire and its publication.

Mr. Glenn Elliott, Adjutant of the Legion and a member of the Publication Committee, testified that he informed the Press on April 22nd, 1932, of this arrangement. This was by telephone, and it was just one day after that upon which the contract was awarded.

Mr. Pollard testified that within three days after Thomas and he had secured the contract, he, personally, sought Mr. Maury, and informed him of the matter and bargained with him to have the Press do the printing. Mr. Pollard prepared the May, 1932, issue of The Legionnaire, and, of course, furnished the Press with the material entering into the composition of the paper. Pollard discussed with Mr. Maury the comtemplated changes in the physical aspect of the paper, some of which were adopted. Under the Pollard-Thomas regime, the office of The Legionnaire was changed to their office in the Times-Dispatch building in Richmond. Mr. Maury visited this office for the purpose of collecting monies due the Press, and for other business reasons.

Prior to the publication of the May issue of the paper, the bills for the printing were sent by the Press to the office of Mr. Glenn Elliott. During the period of the four months, this was discontinued.

Mr. Maury discussed with Mr. Elliott the question of the responsibility for the printing of the four issues, and he was told by Mr. Elliott that the Legion, under the contract, was delivering to Pollard and Thomas, one-twelfth of the annual appropriation, and that if Maury would get an order from that firm, he would be glad to turn that portion over to him.

Mr. Henry M. Taylor, with whom Maury had discussed the obligations of Pollard and Thomas, asked Mr. Elliott to write a letter on the subject to Maury. This letter dated June 4, 1932, is as follows:

"This is your official notification that beginning with the May, 1932, issue of the Virginia Legionnaire, Messrs. R. H. Thomas and Ernest C. Pollard, 501 Tenth Street Building, Richmond, Virginia, are responsible for all obligations in connection with the publication of the paper.

"Our check No. 4675, dated June 3, 1932, in the amount of $326.87, covered in full our indebtedness to you for the April paper and work on the mailing list.

"Sincerely yours,
"W. GLENN ELLIOTT,
"Department Adjutant.

"(Copy to M. E. Bristow, Chairman, Publications Committee.)"

This letter was received by the plaintiff on June 6th, on which date its president, Richmond Maury, wrote the following letter to Mr. Elliott, the defendant's Department Adjutant:

"I thank you for your letter of June 4th, containing your official notification of the shift of responsibility for the publication of the Virginia Legionnaire from the Department of Virginia to Messrs. R. H. Thomas and Ernest C. Pollard. Friday, I believe it was, I had a long visit with Henry Taylor standing in the Capitol Square. We discussed the question of responsibility and the impression I received was not exactly that to be inferred from your letter. I shall go into the matter again with Henry and also with Mr. Bristow.

"On my desk this morning I found a note carrying a tele-

phone message, for which I thank you very sincerely. It has been destroyed."

Mr. Maury failed to take up the matter, referred to in his reply, with Mr. Taylor or Mr. Bristow.

The Press dealt with Pollard and Thomas through the period, billed them, collected money from them, received from them the materials which composed the paper. All this was a plain recognition of their business and contractual relations, which was, in turn, a negation of such relations with the Legion.

When the Press could no longer collect of Pollard and Thomas, it went after the Legion, but not until September 23, 1932.

The bare capitulation and recital of the happenings and circumstances, show that the plaintiff failed in sustaining its contentions and carrying the burden the law imposes upon it.

If, by any course of reasoning, a contract as alleged could be perceived, then its repudiation by the Legion, and the plaintiff's acquiescence in such repudiation, are as certain as circumstances and facts could make them.

It is unnecessary, however, to go into those phases of the matter, or consider the objections to the instructions.

We reverse the judgment of the trial court, and enter judgment for the American Legion, Department of Virginia, the plaintiff in error.

*Reversed and judgment.*